UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

UNITED STATES OF AMERICA                                  :

    - against -                                              :          S4 07 Cr. 3 (BSJ)

HISAN LEE,                                                :
    a/k/a "Devontea Clark,"
    a/k/a "Ice,"                                        :
SELBOURNE WAITE,
    a/k/a "Silky,"                                      :
    a/k/a "Bling,"
DELROY LEE,                                               :
    a/k/a "Specs,"
    a/k/a "DJ,"                                         :
LEVAR GAYLE,
    a/k/a "Train,"                                      :

                           Defendants.     :

------------------------------------------------------------------ X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE EXPERT TESTIMONY

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
    *of America.*

MICHAEL Q. ENGLISH,
MARGARET GARNETT,
TODD BLANCHE,
*Assistant United States Attorneys*
    *Of Counsel.*

February 17, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

UNITED STATES OF AMERICA                               :

    - against -                                        :       S4 07 Cr. 3 (BSJ)

HISAN LEE,                                              :
    a/k/a "Devontea Clark,"
    a/k/a "Ice,"                                    :
SELBOURNE WAITE,
    a/k/a "Silky,"                                  :
    a/k/a "Bling,"
DELROY LEE,                                             :
    a/k/a "Specs,"
    a/k/a "DJ,"                                     :
LEVAR GAYLE,
    a/k/a "Train,"                                  :

                    Defendants.      :

--------------------------------------------------------------------- X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE EXPERT TESTIMONY

The Government respectfully submits this memorandum in opposition to the defendants' motion to preclude or limit the testimony of the Government's proposed ballistics expert, filed on February 15, 2010. Defendants argue that (i) the proposed ballistics testimony should not be admitted at all because it cannot satisfy the standards of Rule 702, *Daubert*, and *Kumho Tire*; (ii) alternatively, if the Court permits the testimony, it should be limited in certain ways; (iii) the proposed testimony (regardless of limitation) would violate the defendants' confrontation rights under *Crawford* and *Melendez-Diaz*; and (iv) no evidence (ballistics or otherwise) should be admitted regarding two shootings in July 2004. For the reasons set forth below, the Government respectfully submits that the evidence that the Government proposes to admit is both relevant and admissible and the defendant's motion should be denied in its entirety.

**BACKGROUND**

On April 2, 2005, Sgt. Christopher McCormack of the New York City Police Department ("NYPD") recovered a 9mm Ruger handgun (the "Ruger") from a closet in use by defendant Delroy Lee.[1]  The gun was discovered in the course of investigating the homicide of Bunny Campbell, which had occurred the previous evening, just down the hall from the closet where the Ruger was stored and the bedroom that Delroy Lee shared with his girlfriend Corrine Grant.  The Ruger was submitted to the NYPD Ballistics Laboratory for analysis.  Once at the Ballistics Lab, the Ruger was test-fired and four comparisons were made with the resulting bullets and shell casings: (1) the bullets were microscopically compared to the bullets that the Medical Examiner had recovered from Bunny Campbell's body; the examiner determined that the bullet's from Campbell's body had <u>not</u> been fired from the Ruger; (2) after the bullets and shell casings from the Ruger test-firing were put through the NYPD's "Brasscatcher" ballistics-comparison database, they were microscopically compared to bullet fragments and eight shell casings from the scene of a robbery at 3955 Paulding Avenue on March 24, 2005[2]; the examiner determined that the casings recovered from the robbery scene were fired by the Ruger[3]; (3) the shell casings from the Ruger were microscopically compared to six shell casings recovered from

---

[1] The recovery and admissibility of this gun was the subject of a suppression hearing before the Court in July 2009, at which now-Capt. McCormack testified regarding its discovery.  Following the hearing, the Court denied Delroy Lee's suppression motion and ruled the gun admissible.  This gun forms the basis for Count Thirty-Five, which charges Delroy Lee with being a felon in possession of a firearm.

[2] This robbery is the subject of Counts Fourteen and Twenty-Seven in the Indictment, and Racketeering Act Eight; the only defendant charged in connection with that robbery is Selbourne Waite.

[3] The microscopic comparison of the bullet fragments recovered from the robbery to the Ruger was deemed "inconclusive."

the scene of a July 16, 2004 shooting in front of 3569 DeKalb Avenue; the examiner determined that five of those six casings had been fired by the Ruger; and (4) the bullets and casings from the Ruger were microscopically compared to three casings and a bullet recovered from the scene of a July 30, 2004 shooting in front of 3599 Bainbridge Avenue; the examiner determined that the three casings had been fired by the Ruger.

The Government intends to call Detective Luis Fontanez of the New York City Police Department to testify at the trial regarding these four ballistics comparisons. Among other qualifications, Detective Fontanez: (i) has been qualified as an expert witness, including as an expert in the microscopic examination of firearms, over 320 times in state and federal courts in the Southern and Eastern Districts of New York and the five boroughs of New York City; (ii) he has been employed by the Firearms Analysis Section of the New York City Police Department for approximately twelve years; and (iii) he has been engaged in the microscopic examination of firearms there for approximately seven years, during which time he has examined and opined on thousands of pieces of ballistics evidence. Although two of the four comparisons described above were originally done by another firearms examiner (now-retired Detective Kevin Barry), Detective Fontanez has done his own microscopic comparison of the ballistics evidence in those two instances and reached his own conclusion regarding his expert opinion on the source of the relevant casings. Those conclusions will form the basis for his testimony. During his proposed testimony, we expect Detective Fontanez to testify about (i) his training, qualifications, and experience in the field of firearms and ballistics examination; (ii) the foundations of the field of firearms and ballistics examination, including the operation of firearms, the effects of the manufacturing process on firearms and ballistics evidence, toolmark identification, and use of the comparison microscope; and (iii) his opinion, based on his training

and experience, that the shell casings recovered from the March 24, 2005 robbery scene at 3955

Paulding Avenue, the July 16, 2004 shooting scene on DeKalb Avenue, and the July 30, 2004

shooting scene on Bainbridge Avenue were all fired from the Ruger handgun (which other

testimony will establish was recovered from Delroy Lee's closet on April 2, 2005), that the

Ruger handgun did <u>not</u> fire the shots that killed Bunny Campbell, and that those opinions are

based on the application of his training and experience to the microscopic examination and

comparison of the relevant ballistics evidence and the toolmarks and ballistics impressions

present on that evidence.

## ARGUMENT

### I.    Expert Ballistics Testimony Is Admissible and No Pre-trial Hearing Is Required

Defendants first argue that ballistics examination as a whole is not admissible as

expert testimony under any circumstances, and that the Court should either have a hearing or

adhere to certain limitations on the testimony (discussed further below).  The total exclusion of

ballistics testimony has no support in the case law, and no hearing is required to reach that

conclusion.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

With respect to the admissibility of expert opinion testimony under Rule 702, the

Supreme Court has adopted a two-step inquiry to determine "whether the reasoning or

methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert* v. *Merrell Dow*, 509 U.S. 579, 592-93 (1993).  Before admitting such testimony, the district court must determine (1) that the proffered testimony is scientifically based and therefore reliable; and (2) that the proffered testimony will be relevant and helpful to the trier of fact.  *See United States* v. *Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (*Daubert* standard requires that "the proffered scientific evidence is both relevant and reliable").  In *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that "the basic gatekeeping obligation" of *Daubert* applies to all expert testimony, including from fields other than the physical or natural sciences. *Id.* at 147.

While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *see Daubert*, 509 U.S. at 593 n. 10, the district court is the ultimate gatekeeper.  The Federal Rules of Evidence assign to the court 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.  In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

In *Kumho Tire*, the Supreme Court emphasized that *Daubert* is to be applied flexibly and that "*Daubert*'s list of specific factors," however, "neither necessarily nor

5

exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141.  In fact, a "review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Travelers Property & Cas. Corp.* v. *General Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001).  Indeed, the Second Circuit uses a particularly broad standard in determining the admissibility of expert opinion testimony under Rule 702.  *See, e.g.*, *Boucher* v. *United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions).

In carrying out its gatekeeper function, the Court must keep in mind the Supreme Court's admonition in *Daubert* that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States* v. *Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006); 4 Joseph M. McLaughlin, Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[5], at 702-20 (2d ed. 2005) ("Trial courts should be aware of the curative powers of the adversary system when faced with an objection that is solely on the basis of confusion.").  As noted by the *Monteiro* court, the Court should also bear in mind that

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.  As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert*, 509 U.S. at 590, . . . , it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.  In short, *Daubert* neither requires nor empowers trial courts  to determine which of several competing scientific theories has the best provenance.  It demands only that the

> proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Monteiro*, 407 F. Supp. 2d at 358.

Courts, in this District and elsewhere, have overwhelmingly concluded that expert testimony related to the field of ballistics evidence, and the microscopic examination of ballistics evidence in particular, is the proper subject of expert testimony and is admissible under Rule 702 and the standards set forth in *Daubert*.  As another Court in this District found, in rejecting a defendant's request for a  hearing:

> The Court has not conducted a survey, but it can only imagine the number of convictions that have been based, in part, on expert testimony regarding the match of a particular bullet to a gun seized from a defendant or his apartment.  It is the Court's view that the Supreme Court's decisions in *Daubert* and *Kumho Tire*, did not call this entire field of expert analysis into question.  It is extremely unlikely that a juror would have the same experience and ability to match two or more microscopic images of bullets.  In fact, in one recent opinion, the Supreme Court used the example of expert testimony on ballistics to provide a contrast to the marginal utility of polygraph evidence.  The Court stated "unlike expert witnesses who testify about factual matters outside the juror's knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth." *See United States v. Scheffer*, 523 U.S. 303, 312 (1998).

*United States v. Santiago*, 199 F. Supp. 2d 101, 111-12 (S.D.N.Y. 2002).  *See also United States v. O'Driscoll*, 2003 WL 1402040, at *2 (M.D.Pa. 2003) ("the field of ballistics is a proper subject for expert testimony and meets the requirements of Rule 702."); *United States v. Cooper,* 91 F. Supp. 2d 79, 82 (D.D.C. 2000); *Hamilton v. Miller*, 292 F. Supp. 2d 437, 442 (E.D.N.Y. 2003) (Weinstein, J.) (on habeas petition, noting that trial court admitted expert testimony based

on microscopic comparison of cartridge extractor marks where expert testified that live round recovered from defendant "matched" spent shell casing recovered from murder scene, meaning that they had at one time been in same weapon).  The use of ballistics evidence has, in fact, become so routine that its admissibility is more often presumed than litigated.

As the court in *Monteiro* recognized, for decades, both before and after the Supreme Court's seminal decisions in *Daubert* and *Kumho Tire*, no federal court has ever deemed inadmissible the type of firearms identification testimony challenged by defendants here.  407 F. Supp. 2d at 364.   The defense brief does not and cannot cite a single case in which a court held the methodology employed in this case – the traditional pattern matching analysis – was not sufficiently reliable to be admitted as expert testimony under Rule 702.  Indeed, the very cases cited by the defense in its brief as raising an "increasing level of concern" about ballistics pattern-matching testimony (Def. Br. 6) ultimately conclude that the testimony is admissible and that it rests on a sufficient foundation (whether or not characterized as "science" — as Rule 702 and the cases make clear, expert testimony is not limited to those disciplines universally deemed "science.").  *See, e.g., Monteiro*, 407 F. Supp. 2d at 359-65*; United States v. Glynn*, 578 F. Supp. 2d 567, 574-75 (S.D.N.Y. 2008) (Rakoff, J.)[4]; *United States v. Mouzone*, 2009 WL 3617748 (D. Md. Oct. 29, 2009) (Magistrate's Report & Recommendation, not yet adopted by the district court); *United States v. Diaz*, 2007 WL 485967, *13-14 (N.D. Cal. Feb. 12, 2007); *United States v. Green*, 405 F. Supp. 2d 104, 124 (D. Mass. 2005).  *See also United States v. Taylor*, __ F. Supp. 2d ___ , 2009 WL 3347485 (D.N.M. Oct. 9, 2009); *United States v. Willock*, 2010 WL 118371, *13-14 (D. Md. Jan. 7, 2010).

---

[4] In the precursor case before Judge Rakoff, discussed in *Glynn*, the ballistics expert whose testimony was admitted by Judge Rakoff was Detective Fontanez.

Moreover, no pre-trial hearing is required for the Court to make a preliminary determination regarding Detective Fontanez's anticipated testimony. In *United States v. Williams*, 506 F.3d 151 (2d Cir. 2007), the Second Circuit made imminently clear that while *Daubert* gatekeeping requires a district court to ascertain the reliability of a ballistics expert's methodology, it does not necessarily require a separate hearing be held in order to do so. *Williams*, 506 F.3d at 161. In *Williams,* the defendant moved for a pretrial *Daubert* hearing to challenge the government's ballistics expert's testimony, contending that the government had yet to establish its admissibility under Rule 702. *Id.* at 157 (*see also United States v. Williams*, 2004 WL 2980027 (S.D.N.Y. Dec. 22, 2004)). The district court denied the motion without a hearing, citing several cases upholding the use of ballistics expert testimony as reliable under Rule 702. *Id.* On appeal, the defendant challenged the district court's decision (i) denying him a *Daubert* hearing and (ii) failing to undertake an adequate inquiry into the reliability of the government's expert's firearms identification methodology. The Second Circuit rejected the defendant's contention that the district court abused its discretion by denying his request for a hearing. The Court noted that while the gatekeeping function requires the district court to ascertain the reliability of an expert's methodology, it does not necessarily require that a separate hearing be held. The Court then found that the reliability of an expert's methodology can be determined by the district court (i) by consideration of the use of ballistics expert testimony in other cases and (ii) by ensuring that before expert testimony is presented to a jury, the proponent of that testimony provides a foundation for the witness's expertise including the witness's experience and training. *Id.* at 161.

The holding in *Williams* is consistent with a long line of Supreme Court and Circuit Court case law on the requirements for admission of proffered expert testimony. *See, e.g., Kumho Tire*, 526 U.S. at 152 (district courts possess "latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); *United States* v. *Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into . . . reliability must take . . ."); *United States* v. *Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("Under *Daubert*, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered."); *United States* v. *Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) (pre-trial hearing not required because "the challenged evidence does not involve any new scientific theory and the testing methodologies are neither new or novel"); *see also United States* v. *Santiago*, 199 F. Supp. 2d at 112 (denying pre-trial hearing and noting that, at trial, Government to elicit from its ballistics expert his training, experience, qualifications, and testimony regarding the methods used); *United States* v. *Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (denying defendant's request for pre-trial evidentiary hearing with respect to, among other things, fingerprint expert testimony); *Bank Brussels Lambert* v. *Credit Lyonnais (Suisse)*, 2000 WL 1694321, *1 (S.D.N.Y. Nov. 13, 2000) ("[T]he trial judge is not required to hold a hearing on the admissibility of expert evidence"). "This is particularly true if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *United States* v. *Williams*, 506 F.3d at 161.

The defense discussion of the National Research Council ("NRC") report and Professor Adina Schwartz's publication does not change this analysis. (Def. Br. 9-13). First, each of the cases cited in the defense brief, and noted above, concerning pattern-matching

10

ballistics testimony have considered these documents (and, in some cases, testimony or affidavits from Professor Schwartz) and have nonetheless universally reached the conclusion that this type of expert testimony is admissible under Rule 702. Second, neither document supports a ruling that the Government's proffered ballistics testimony is inadmissible. The underlying principle of firearms identification is that each firearm will transfer a unique set of marks on bullets and cartridge cases when ammunition is fired from that gun. The admission by courts of expert ballistics evidence over the years has been premised on this principle. By using a comparison microscope to compare ammunition test fired from a recovered gun with spent bullets and cartridge cases from a crime scene, a trained and experienced firearms examiner can reach a conclusion regarding whether the recovered ammunition was fired from that particular gun. *See Monteiro*, 407 F. Supp. 2d at 359. Patterns produced on bullets and cartridge cases from contact with barrels and firing pins can be microscopically compared to determine if they have originated from a common source. The theory underlying firearms identification is that no two firearms will produce exactly the same microscopic features on bullets and cartridge cases such that, if there are sufficient markings to reach a conclusion, they could be falsely identified as having been fired from the same firearm. *Id.* (quoting Erich D. Smith, *Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework*, 36 AFTE J. 130 (2004)). Recent scientific studies have demonstrated that the underlying principle that firearms leave unique marks on ammunition has continuing validity. *See, e.g.,* Smith, *supra*, at 130-31 (noting that studies have confirmed that tests have showed that consecutively manufactured gun barrels left unique marks on bullets fired through them); Amy C. Coody, *Consecutively Manufactured Ruger P-89 Slides*, 35 AFTE J. 157 (2003) (finding that with respect to consecutively manufactured Ruger pistols "variations, combined with other imperfections and

irregularities that occurred during the manufacturing process, result in unique, individual breechface marks that can be positively identified."); *see also* Stephen G. Bunch and Douglas P. Murphy, *A Comprehensive Validity Study for the Forensic Examination of Cartridge Cases*, 35 AFTE J. 201 (2003); Francesco Vinci, Piazza Giulio Cesare, Carlo P. Campobasso, James A. Bailey, *Morphological Study of Class and Individual Characteristics Produced by Firing 2500 Cartridges in a .45 Caliber Semi-Automatic Pistol*, 37 AFTE J. 368 (2005); Robert J. Shem and Peter P. Striupaitis, *Comparison of 501 Consecutively Fired Bullets and Cartridge Cases From a 25 Caliber Raven Pistol*, 15 AFTE J. 109 (1983); Yoshimitsu Ogihara, *Comparison of 5000 Consecutively Fired Bullets and Cartridge Cases From a 45 Caliber M19111A1 Pistol*, 15 AFTE J. (1983); Shane J. Kirby, Comparison of 900 Consecutively Fired Bullets and Cartridge Cases From a 455 Caliber Smith & Wesson Revolver.

The NRC report does not find to the contrary. The purpose of the report itself was to address "the feasibility, accuracy, and reliability, and technical capability of developing and using a national computerized database as an aid to criminal investigations[,]" NRC Report at ES-1, and not the validity or assumptions of firearms identifications. The NRC committee's charge was to determine the extent to which the toolmarks left on bullets and cartridge casings after firing a weapon can be captured by computer imaging technology. NRC Report at ES-1, 3. The committee which prepared the report was also asked to assess whether a ballistics computerized image databases would be feasible and operationally useful in generating leads for follow-up and further investigation. NRC Report at ES-3. The committee was not charged with assessing the methodology of firearms identification and did not undertake any research as to

whether firearms toolmarks are unique.  Thus, the authors of this report made no finding as to the actual uniqueness of firearms-related toolmarks.[5]

The defense brief points to the NRC report's "finding" – that the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated.   But as acknowledged by the committee in its report, it was not the function of the committee and this report "to assess the general validity of firearms identification and toolmark examinations nor their admissibility in court proceedings[,]" nor did the committee question the principles regarding toolmark uniqueness in firearms.  NRC Report at 3-22.   The committee went on to acknowledge that

> There is a baseline level of credibility, however, that must be demonstrated lest any discussion of ballistics imaging be rendered moot – namely, that there is at least some "signal" that may be detected.  In other words, the creation of toolmarks must not be so random and volatile that there is no reason to believe that any similar and matchable marks exist on two exhibits fired from the same gun.  *The existing research, and the field's general acceptance in legal proceedings for several decades, is more than adequate testimony to that baseline level.  Beyond that level, we neither endorse nor oppose the fundamental assumptions.*

NRC Report at 3-22-3-23 (emphasis added).  Finally, the report does not identify any new scientific studies that undermine the fundamental principle that in fact firearms leave unique markings on bullets and cartridge cases.  Thus, we submit, the defense reliance on this portion of

---

[5] There were no firearms and toolmark examiners on the committee that drafted the NRC report. The committe was essentially comprised of academics in the fields of public policy, computer science and the material sciences, as well as individuals from private industry.  *See* NRC Report at FM-v.  For reasons unexplained, active firearms and toolmark examiners were deliberately excluded. *See* NRC Report at FM-ix.

13

the report does not undermine the consistent and unbroken line of court decisions ruling firearms identification evidence admissible.

The defense brief also points to a publication by Professor Adina Schwartz. (Def. Br. 12). While Professor Schwartz has served as a defense expert on firearms and toolmark identification in a number of cases and has testified at admissibility hearings in two of those matters, she is not an expert in the field of firearms identification and has no apparent expertise in the field of toolmark examinations. As far as the Government is aware (from affidavits and testimony Professor Schwartz has offered in other cases), she has never held the position of firearms/toolmark examiner in any crime laboratory or law enforcement agency; has never received training or been qualified as a firearms/toolmark examiner; and has never testified in the capacity of a trained and experienced firearms/toolmark examiner and rendered an opinion with respect to whether bullets or cartridge cases could be matched to a particular firearm. Furthermore, in the cases that we are aware of in which Professor Schwartz has either testified or submitted an affidavit, the courts have disagreed with her views with respect to the methodology and subjectivity of firearms identification; the supposed difficulty of detecting individual characteristics versus class and sub-class characteristics on bullets and cartridge cases; the error rate for firearms identification; and peer-review of the techniques underlying firearms identification. *See Diaz*, 2007 WL 485967 (N.D. Cal. Feb.12, 2007) (testified); *Monteiro*, 407 F. Supp. 2d 351 (affidavit submitted); and *United States* v. *Khalid Barnes*, Decision and Order, 04 Cr. 186 (SCR) (S.D.N.Y. 2008) (affidavit submitted). In addition, Professor Schwartz's views have been expressly challenged in the literature. *See* Richard Grzybowski, Jerry Miller, Bruce Moran, John Murdock, Ron Nichols, & Robert Thompson, *Firearms/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, 35 AFTE J. 209

14

(2003); Dominic J. Denio, *The History of AFTE Journal, The Peer Review Process, and Daubert Issues*, 34 AFTE J. 210 (2002).[6]

In sum, there is no basis for the Court to preclude Detective Fontanez's testimony as a general matter, nor is any hearing necessary on the issue.  The Government is unaware of any federal case excluding ballistics testimony of this type because the field does not satisfy Rule 702's requirements, and the defense has pointed to none.  The very cases relied upon by the defendants have found the testimony admissible, and the *same expert*, offering the same type of testimony, has been deemed by Judge Rakoff to satisfy the standards for admissibility under Rule 702, despite Judge Rakoff's apparent reservations about this type of testimony in general. *Glynn*, 578 F. Supp. 2d at 568.  This portion of the defendants' motion should be denied.

## II.     The Particular Ballistics Testimony Here is Admissible

The defense next argues that, if the Court is inclined (along with every federal court to have considered the issue) to allow the Government's proffered ballistics testimony, it should limit that testimony in four ways: "(1) the witness be permitted to offer opinion testimony, but may not be referred to as an 'expert'; (2) the witness may not testify as to his/her opinion on whether the casings are attributable to a single firearm to the exclusion of all other firearms; (3) the witness may not testify as to his/her opinion on whether the casings match each other to a reasonable degree of scientific or ballistics certainty - no level of certainty should be permitted; (4) the witness may not testify as to his/her opinion to a reasonable degree of scientific or ballistics certainty." (Def. Br. 15).

---

[6]  The Government can provide copies of the articles referenced herein, if the Court wishes.

As to the first request, the Government is aware of no possible basis for this request. A witness whose testimony is permitted under Rule 702 is, by definition, being permitted to offer their testimony as an "expert" witness, at least within the legal and evidentiary meaning of that word. First, however, we should note that the Government does not intend to ask Detective Fontanez whether he believes that he is an "expert" in ballistics analysis. Rather, the Government expects that, after eliciting the bases contemplated by Rule 702, the Government will ask the Court for permission to offer the balance of Detective Fontanez's testimony under Rule 702. However, we believe it would be perfectly proper for any party to refer to Detective Fontanez in summations as an "expert witness" in the field of ballistics examination (or, similarly, to challenge his credentials or his methodology or his conclusions), assuming the Court permits him to testify about his opinions pursuant to Rule 702. In addition, we have requested that the Court give the jury an instruction regarding expert witnesses, and have submitted for the Court's consideration the standard charge in this District, which simply reminds the jury that they have heard testimony from a number of people qualified as experts (here, pathologists from the medical examiner's office, ballistics examiners, and a Patois-to-English translator), explains what that designation means with respect to trial witnesses, and instructs them that they are to weigh the credibility of those witnesses and give their testimony whatever weight it deserves, suggesting particular ways they could evaluate the credibility or reliability of experts in particular. (Government's Requests to Charge at 138-39). The Government submits that this instruction is perfectly appropriate and routine. We see no basis whatever, in the caselaw or in common sense, to forbid any reference to Detective Fontanez as an expert, if he is otherwise permitted to testify under Rule 702.

16

The remaining three requests appear unlikely to be at issue.  After eliciting testimony from Detective Fontanez about the methodology employed in the microscopic comparison of ballistics evidence, the Government expects to ask Detective Fontanez, based on the application of this methodology and his training and experience to his observations of the four sets of ballistic evidence, what his opinion is about the relationship between the various pieces of crime scene evidence and the Ruger firearm recovered from Delroy Lee's closet.  We anticipate that he will say that it is his opinion that the shell casings from the three crime scenes were ejected from the Ruger.  We do not presently expect to ask Detective Fontanez to characterize his opinion beyond that statement, in terms of levels of certainty or the like.  The Government respectfully submits that cross-examination (by counsel who, based on their motion, are clearly familiar with the potential issues related to ballistics examination) as to error rates, the possibility that another examiner could reach a different conclusion, the subjective aspects of the generally-accepted methodology in ballistics examination, and so on, will be more than adequate to vitiate defense counsel's concerns.[7]

## III.    There Is No Confrontation Clause Issue

The defense motion asserts that there may be confrontation clause issues raised by the Government's anticipated expert testimony, in violation of *Crawford v. Washington*, 541 U.S. 36 (2004) and *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).  However, this argument appears to be based on a misunderstanding of the Government's expert notice.  As noted above, Detective Fontanez will be asked to testify only about microscopic comparisons

---

[7] Of course, it is possible that defense counsel, on cross-examination, will elicit statements about the witness' level of confidence in his conclusions.  If that occurs, the Government should be permitted to ask appropriate follow-up or clarifying questions on re-direct, if necessary.

that he has personally conducted, and what his conclusions are in connection with those observations.  He will not be asked to testify about what another, non-testifying, expert observed or concluded.

Similarly, the chemist who originally tested the crack cocaine recovered from several defendants in Amherst County, Virginia, is now deceased and the drugs themselves were destroyed long ago.  However, it is the Government's understanding that the raw data generated by the mass spectrometry/gas chromatography equipment in the lab still exists.  We believe that we can establish, through non-hearsay testimony by available witnesses, that that raw data was generated from the crack cocaine seized from the defendants.  Further, we are prepared to call as a witness another chemist who re-evaluated that raw data and will testify about her own expert conclusions as to whether the substance tested was in fact cocaine or cocaine base.  Accordingly, we do not anticipate a Confrontation Clause issue with this testimony either.

## IV.    The Evidence Related to the Two July 2004 Shootings Is Admissible

Finally, the defense brief argues that no evidence or testimony about the two July 2004 shootings on DeKalb and Bainbridge Avenues should be admitted at trial for any purpose. In brief, NYPD officers responded to reports of shots being fired in front of 3569 DeKalb Avenue on July 16, 2004, and shots being fired in front of 3599 Bainbridge Avenue on July 30, 2004.  In both cases, shell casings were collected from the scene, some of which were matched to the Ruger firearm by the NYPD ballistics laboratory.  We expect to present testimony from the police officers who responded to the crime scenes and collected the shell casings that were sent to the laboratory for analysis.  The Government is not certain who fired the shots that produced those shell casings.  However, we expect there to be testimony at the trial from numerous witnesses that the drug dealing activity of the DeKalb Avenue Crew racketeering

18

enterprise, and the narcotics conspiracy charged in Count Seven of the Indictment, was centered around the two blocks of DeKalb Avenue between Gun Hill Road, to the south, and E. 213th Street, to the north.[8]  As the Court can see from the attached map, this area is quite isolated and insular, due to its location between Van Cortlandt Park on the west and Woodlawn Cemetery on the east, and we expect there to be cooperator testimony about the insularity of this small triangle of the Bronx, and how that geography affected the narcotics-dealing activity of the enterprise and conspiracy.  Moreover, we expect that several witnesses will testify that, during the summer of 2004 in particular, there was a serious and ongoing dispute between members of the charged racketeering enterprise and narcotics conspiracy, on the one hand, who were still selling drugs on DeKalb Avenue, and members of a rival group of a rival group of drug dealers who were primarily operating on Rochambeau Avenue, just one block to the east.  This dispute involved regular shoot-outs in the vicinity of DeKalb Avenue, as well as other acts of violence and attempted violence.  Finally, we expect various cooperating witnesses to testify that, during the course of the charged racketeering enterprise and narcotics conspiracies, members shared firearms with each other, and frequently used a shared pool of firearms to further the goals of the enterprise and the narcotics conspiracy.

The admissibility standard for relevance of evidence is whether it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. Defendants Hisan Lee, Delroy Lee and Selbourne Waite are each charged with being members

---

[8]  Nor do we expect this to be much in dispute.  For example, Delroy Lee was arrested for selling drugs in front of 3574 DeKalb in June 1998, and in front of 3511 DeKalb in June 2000 (for which he pled guilty to a narcotics felony).

of a racketeering enterprise centered around DeKalb Avenue between 1997 and 2007. Each of these three defendants is alleged to have engaged in the specified racketeering act of distributing, or possessing with intent to distribute, crack cocaine, powder cocaine, and marijuana. The enterprise is alleged to have used violence, including firearms, to maintain its illegal activities, protect its members, and further its goals. In addition, each of these three defendants is charged with being a member of a narcotics distribution conspiracy that operated in the vicinity of DeKalb Avenue between 1997 and 2007, and each of these three defendants is also charged with using, carrying, and possessing firearms in furtherance of this narcotics conspiracy, which firearms were discharged in the course of the conspiracy. They are also charged with aiding and abetting the use, carrying, and possession of firearms in furtherance of the drug conspiracy.

Given these charges and the anticipated testimony outlined above, the fact that a gun that was in the possession of Delroy Lee on April 2, 2005, and that was discharged by Selbourne Waite in the course of an armed robbery on March 24, 2005, was also discharged on the street on July 16 and July 30, 2004 within a small sliver of the Bronx that just happens to be the center of the charged racketeering enterprise and narcotics conspiracy, is highly probative of several disputed issues, including the existence of the charged racketeering enterprise; the existence of the charged narcotics conspiracy; the fact that guns were used, carried, possessed, and discharged in furtherance of the narcotics conspiracy by its members; the close connection, and intertwined criminal relationship, between Delroy Lee and Selbourne Waite and the criminal activities on DeKalb, which is relevant to whether they were members of the charged racketeering enterprise and narcotics conspiracy. The evidence is not unduly or unfairly prejudicial under Rule 403, because it is highly probative and is certainly no more inflammatory than other evidence in the trial, including the defendants' participation in various armed home

20

invasion robberies, shootings, and murders.  Finally, the suggestion that evidence related to the two July 2004 shootings is Rule 404(b) evidence is absurd.  These shootings took place right in the middle of the charged racketeering enterprise and narcotics conspiracy (and linked firearms charge), and we expect that the evidence will establish that it is more probable than not that these shootings are connected to the charged enterprise and conspiracy, are directly probative of their existence, and provide circumstantial evidence of the defendants' membership in and association with them.

The Government respectfully submits that the evidence of the two July 2004 shootings is relevant and admissible evidence.  The defendants' motion to preclude it should be denied.

Dated: New York, New York
       February 19, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  _____/S/_____

MICHAEL Q. ENGLISH
MARGARET GARNETT
TODD BLANCHE
Assistant United States Attorneys
(212) 637-2200